FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 MAY 30  AM 8:47

U.S. DISTRICT COURT
N.D. OF ALABAMA

MELVIN TURNER,                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )
                                  )
STEVENS GRAPHICS, INC.,           )
                                  )
        Defendant.                )

Civil Action No.

99-AR-0426-S

ENTERED

MAY 30 2000

### MEMORANDUM OPINION

Before the court is defendant's motion for summary judgment.

Plaintiff, Melvin Turner ("Turner"), alleges that defendant,

Stevens Graphics, Inc. ("Stevens"), violated Title VII of the Civil

Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981 ("§ 1981")

when it terminated him and failed to promote him on the basis of

race, and when it disciplined him more harshly than white employees

who engaged in the same behavior.  Turner also alleges that Stevens

subjected him to a racially hostile work environment and that it

retaliated against him for engaging in protected activity under

Title VII and § 1981.[1]  For the reasons set out more fully below,

Stevens' motion will be granted in part and denied in part.

---

[1]  The court notes that the analytical framework for assessing claims
of disparate treatment under Title VII and 42 U.S.C. § 1981 is the same.  See
Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377-2378
(1989).

## Pertinent Disputed and Undisputed Facts

Stevens prints, binds, and distributes telephone directories. Stevens hired Turner in October of 1991 as a general laborer in the Bindery Department.  During his employment, Turner was classified as a "B Worker."  The Bindery Department binds, trims and packages telephone directories and ships them to Stevens' customers.  Fred Coats ("Coats"), who is white, is the Manager of the Bindery Department.  Jerry Langham ("Langham"), who was Turner's direct supervisor, reports directly to Coats.  Coats in turn reports to Fred Ondrako ("Ondrako"), the plant manager.

Stevens staffs a human resources department.  At all relevant times, Louis B. Rideout ("Rideout") was the head of human resources.  Rideout reports to Ondrako on personnel matters at the plant.  Rideout is black.

In October of 1997, Stevens discharged Eric Kopp ("Kopp"), one of its bindery supervisors, leaving a vacant position.  Turner claims that after he learned of the job opening, he went to Coats and told him that he wanted to apply for the supervisory position. Turner claims that Coats would not allow him to apply and that Coats told him to get out of his office.  On January 2, 1998, Lou D'Autremont retired, leaving another bindery supervisor position vacant.  Therefore, as of January 2, 1998, there were two bindery

2

supervisor positions available.

On January 6, 1998, Robbie Craig ("Craig") applied for one of the bindery supervisor positions. On January 15, 1998, Coats wrote a letter to Craig which confirmed Craig's acceptance of the bindery supervisor position on January 14, 1998. (Exhibit 17, Pl.'s Evidentiary Submission in Support of Pl.'s Response to Def.'s Motion for Summ. J.)

It is not clear to the court whether Craig replaced Kopp or D'Autremont. Coats testified in his deposition that both positions were open when Craig applied, and that he thinks that Craig took Kopp's position. However, on January 19, 1998, Coats filled out a personnel requisition form which stated that he needed a replacement for Kopp.[2]

Regardless of who Craig replaced, it is undisputed that as of January 19, 1998, there was still one opening for bindery supervisor. As a result, Stevens posted the job opening on January 20, 1998. Turner claims that he went to the Personnel Department and requested an application for the job, but that two employees in personnel refused to give him an application. Turner says he then went to Coats and requested an application, but Coats told him that

---

[2] This uncertainty is not material for summary judgment purposes as will be explained on pages 11 and 12 of this opinion.

he did not have any applications and that he should come back in a year.  Turner also claims that at some point he heard Langham tell Coats not to let Turner fill out an application to which Coats replied, "I'm not going to let that nigger fill out no application." Coats denies making this statement.

Turner says that he then went to Ondrako to get an application. He claims that Ondrako told him to put something in writing stating why he wanted to be a supervisor and what would make him a good supervisor. Turner wrote a letter to Ondrako, dated April 20, 1998, stating that he wanted to apply for the bindery supervisor position. That position was filled at some point in April by Bill Fowler ("Fowler").

Stevens points out that the collective bargaining agreement requires it to award positions to qualified bidders based on seniority. By posted company policy, "qualified" bidders are, among other things, employees who have no written warnings in the 12 months preceding the job posting. Because Turner had written warnings for violating work rules in March of 1997 and May of 1997, Stevens claims that he was not qualified for the bindery supervisor vacancies left by Kopp in late 1997 and by D'Autremont in January of 1998.

In early April of 1998, Turner attended a union-company

4

bargaining session.  Turner claims that he brought up the issue of racial discrimination at that meeting.  Turner complained that a black operator who had seniority over a white employee was falsely written up in order to disqualify him from a promotion to which he was entitled.  Stevens claims that after the meeting, Turner simply made a comment in passing to Ondrako and Chester Scroggins, the Vice President of Stevens' Manufacturing Operations, that blacks were discriminated against in supervisor selections.

On May 22, 1998, Turner saw Doug Ware ("Ware"), another black bindery worker, asleep on his forklift.  Coats also saw that Ware was asleep and went to look for Langham.  Langham and Coats walked back down to where Ware was sleeping.  Turner says that Langham and Coats began to laugh at Ware.  Turner walked over to Ware and woke him up.  Ware was issued a written warning for sleeping on the job.  Afterwards, Coats told Turner that he had interfered with Coats' investigation by waking up Ware.  Coats wrote up Turner for "insubordination," gave him a five day suspension without pay, put him on probation for one year, and gave him a final notice.

On August 13, 1998, Turner punched out his time card to go to lunch.  Malcolm Wright ("Wright"), one of Turner's co-workers, was standing near Turner.  Coats, who was watching from nearby, called for Turner.  Coats told Turner that he had seen Turner punch out

5

Wright's time card, which was a violation of company policy. Turner claims that Coats also said something to the effect of, "I got you now, my nigger," or "I got you my nigger boy." Coats denies making any such statement. After lunch, Coats called Turner and Wright into his office along with the Union Steward, Cassandra Ellington ("Ellington"). Turner denied that he punched out Wright's time card. Coats then asked Turner for his time card and told him to leave the plant. Coats wrote up Turner for knowingly punching out another employee's time card, gave Turner a five day suspension without pay, and put him on final warning. Stevens subsequently fired Turner.[3] Stevens claims that Rideout alone conducted an independent investigation of the incident and then made the decision to fire Turner. It is undisputed that Rideout conducted grievance proceedings after Turner was disciplined.

### Allegations of Racial Harassment

Turner alleges that the following racially harassing comments were made while he worked for Stevens:

- In the spring of 1998, Coats told Langham, "I'm not going to let that nigger fill out no application" after Turner

---

[3] The court cannot tell from either party's brief exactly when Turner was terminated. Stevens does not point to a particular date and Turner claims in his EEOC charge that he was terminated on August 13, 1998, the day of the time card incident. The court is not aware of any official corrective action sheet which documents Turner's termination.

6

requested an application for Bindery Supervisor.

- On August 13, 1998, when Coats claims that Turner punched out Wright's time card, Coats said either, "Now I got you my nigger," or "I got you my nigger boy."

- Coats called Turner a "boy" on many occasions.

- Langham referred to African-Americans as "niggers" and called a particular African-American employee under his supervision a "nigger."

- Langham laughed at Turner and called him a "boy" on several occasions.

Turner filed charges of discrimination with the EEOC in September and October of 1998.

### Summary Judgment Standard

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that this language means exactly what it says: there must be a genuine issue of material fact, not merely some factual dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard

7

means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S.Ct. at 2511 (citing First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575 (1968)).

On defendant's motion for summary judgment, the court must look at the evidence, construed in plaintiff's favor, to see if a jury could return a verdict for plaintiff.  If so, defendant's motion for summary judgment must be denied.  If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

### Count 1: Termination

Stevens argues that there is no evidence of discriminatory animus because the decision maker, Rideout, conducted his own independent investigation before firing Turner.   Stevens thus attempts to insulate from disparate treatment analysis any racially discriminatory statements that Coats allegedly made to Turner by arguing that Coats was not involved in the decision to fire Turner.

However, the court finds that there is a disputed issue of material fact with respect to whether Coats participated in the decision to terminate Turner.   During Coats' deposition, the following exchange took place:

8

> Q:   And you were involved in the decision to fire Mr. Turner, correct?
>
> A:   I suspended him, correct.  And **we** reviewed the records before termination.

(Coats depo. at 135)(emphasis supplied).

Also, when Coats was asked generally about his authority to fire employees, he replied, "Well, if we get to the point where we- they are probably suspended and would be terminated after investigation if I- that would be done with probably myself and with input from human resources." (Coats depo. at 12.)  When asked whether he was involved in the decisions to terminate employees, Coats replied "Yes, I am."  Id.  With reference to the termination of another employee, Coats stated, "I'm sure I was involved with the final decision [to terminate her].  I don't remember the circumstances, but as a manager, anybody that would have been terminated, I would have been involved." (Coats depo. at 229.)

The court also notes that Coats, not Rideout, signed the corrective action document which suspended Turner for allegedly punching out Wright's time card, and that there is no writing, official or otherwise, that documents exactly when Turner was terminated and by whom.[4]

---

[4]  Stevens has presented documentation of Rideout's conducting a grievance procedure following Turner's suspension.  However, Stevens has not directed the court's attention to any official corrective action sheet which documents when Turner was actually terminated, perhaps because there is none.

Based on the above evidence, the court finds that there is a disputed issue of material fact with respect to whether Rideout made the decision alone, based on independent investigation, or whether Coats was also involved in the decision to fire Turner. Thus, assuming for the purposes of summary judgment that Coats was involved in the decision to terminate Turner, the court finds that Coats' alleged statement to Turner that "Now I've got you, my nigger," would constitute direct evidence of discrimination so as to shift the burden of proof to Stevens. Stevens, of course, may argue that, regardless whether Coats made the statement and regardless of who made the decision to terminate Turner, he violated a work rule and that violation constituted a race neutral reason for his suspension and termination. However, that argument will be made to a jury. Accordingly, the court will deny defendant's motion for summary judgment as to Turner's wrongful termination claim.

## Count 2: Discrimination in Promotion

In order to establish a prima facie case of discrimination in promotion, Turner must show: (1) that he is a member of a protected class; (2) that he applied for and was qualified for the promotion; (3) that, despite his qualifications, he was rejected, and (4) that the employer filled the position with someone outside of his

10

protected class.   See Walker v. Mortham, 158 F.3d 1177 (11th Cir.
1998)(holding that a plaintiff does not have to show, as part of
his prima facie case, that the person promoted was equally or less
qualified).

    1.  Bindery Position in late 1997

    Although Turner in his deposition did not mention a promotion
claim with respect to the bindery position that became available
when Kopp was fired in late 1997, Turner raises this claim in his
reply brief.   However, this court finds that Turner cannot
establish his prima facie case of failure to promote with respect
to this bindery position because he cannot show that he was
qualified for the position.   As the court noted supra, Stevens'
policy prevented an employee who had a disciplinary write up in the
12 months preceding the job posting from being considered for a
promotion.   The posted policy states: "At [the] time of posting,
[the employee] must have...[a] satisfactory work record (no written
warnings in the past 12 months)..." (Ex. L, Cordell Aff.)  Stevens'
records show that Turner was disciplined on March 31, 1997, for
being off his assigned job.   Turner has produced no evidence to
dispute that he was in fact disciplined on March 31, 1997, or that
the discipline itself was discriminatory.  Therefore, regardless of
whether this particular bindery position was filled by Craig in

11

January without being posted or whether it is the position which
was posted on January 20, 1998, and filled by Fowler, Turner was
not qualified for the position.   Therefore, the court will grant
defendant's motion with respect to the bindery position which
became available in late 1997.

### 2.   Bindery Position in January of 1998

Stevens argues that Turner cannot show that he "applied" for
the second bindery supervisor vacancy because by the time Turner
filled out an application, Stevens had already filled the position
with Fowler.   The court finds that there are disputed issues of
material fact with respect to whether Stevens attempted to prevent
Turner from applying for the position that was posted on January
20, 1998, and with respect to exactly when the position was filled.
However, as is true with the other bindery promotion claim, Turner
cannot show that he was qualified for the position because he had
written discipline in the 12 months preceding the time when the job
was posted.   Regardless of whether the job posting on January 20,
1998, was to fill Kopp or D'Autremont's position, the fact of the
matter is that this particular vacancy was posted on January 20,
1998, and Turner had written discipline in the 12 months prior to
that date.

Turner argues, as a separate claim of discrimination, that the

discipline that he received on May 29, 1997, was discriminatory. Turner was written up for violating Stevens' parking regulations, and he claims that whites who committed the same violation were not disciplined. Therefore, the court will not take that particular disciplinary action into account in evaluating Turner's promotion claim. However, as noted *supra*, Turner was disciplined on March 31, 1997 for being off his job. This written discipline occurred within the 12 months preceding the January 20, 1998 job posting. Therefore, regardless of the May 29, 1997, discipline and regardless of whether Coats may have attempted to prevent Turner from applying, Turner was never qualified for the position.[5] Therefore, the court will grant defendant's motion for summary judgment as to plaintiff's promotion claim to the bindery position which was posted in January of 1998.

### 3. Other Promotion Claims

As to any other promotion claims which Turner might have had, he has made no arguments and presented no evidence to the court

---

[5] There are also two other notes in Turner's file which appear to be disciplinary in nature. One is dated July 7, 1997 and the other is dated August 7, 1997. However, they are not on official "Notice of Corrective Action" sheets like all of the other entries. Furthermore, the court is not exactly sure what those notes mean. They are either indecipherable or unclear with respect to Turner's actions and whether he was disciplined, and Stevens' briefs do not aid the court in determining what the notes mean. Therefore, the court's decision is based on the March 31, 1997 disciplinary action only.

13

regarding other positions.  The Eleventh Circuit has made it clear

that "In opposing a motion for summary judgment, 'a party may not

rely on his pleadings to avoid judgment against him.' . . . Grounds

alleged in the complaint but not relied upon in summary judgment

are deemed abandoned."  Resolution Trust Corp. v. Dunmar Corp., 43

F.3d 587, 599 (11th Cir. 1995)(citations omitted).  See also Harris

v. Warehouse Services, Inc., 77 F. Supp. 2d 1240, 1248 (M.D. Ala.

1999)(citing Resolution Trust Corp. and holding same).  Therefore,

defendant's motion is due to be granted as to any other promotion

claims.[6]

### Count 3:  Racially Hostile Work Environment

In Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct.

2275 (1998) and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742,

118 S.Ct. 2257 (1998), the Supreme Court decided whether and under

what circumstances an employer is vicariously liable for its

employees' harassing behavior.  The Supreme Court held that, in

certain circumstances, an employer can be liable for the harassing

---

[6]  Even if Turner had made arguments in his brief regarding the four A-Worker positions which he mentions in his deposition, the court would still grant Stevens' motion as to those claims.  As Stevens correctly points out, two of those claims (from 1996) are outside the 180 day limit for filing an EEOC charge.  The other two positions were filled by black employees, which obviously negates one element of Turner's prima facie case because he cannot show that the positions were filled with employees outside his protected class.

actions of its **supervisory** employees.   However, the court did not hold that an employer can be vicariously liable for harassing behavior of non-supervisory employees.   Therefore, in evaluating whether a hostile work environment existed in this case, the court will look at the  harassing comments allegedly made by Turner's supervisors only.

In order to establish a prima facie case of a racially hostile work environment, Turner must show that: (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment. See Henson v. City of Dundee, 682 F.2d 897, 903-905 (11th Cir. 1982).

As the Supreme Court has made clear

[N]ot all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. . . . For [harassment] to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment.

Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405 (1986)(citations omitted).

Factors to consider in determining whether the harassment is sufficiently severe or pervasive include the frequency of the conduct, the severity of the conduct, whether the conduct is

15

threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work.  See Edwards v. Wallace Community College, 49 F.3d 1517, 1521-22 (11th Cir. 1995)(citing Harris v. Forklift Systems, Inc., 114 S.Ct. 367, 372 (1993)).

Based on the above factors, Turner has failed to demonstrate that any comments allegedly made by supervisors Coats and Langham were severe or pervasive so as to alter his working conditions. While Coats and Langham's alleged statements are certainly inappropriate and derisive, this is not a situation in which the racial comments were so "commonplace, overt, denigrating, pervasive and shocking" as to create an abusive working environment.  See, e.g., E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990).  Put simply, "It is well established that isolated and sporadic incidents of harassment are insufficient to create a hostile working environment."  Ellis v. Wal-Mart Stores, Inc., 952 F.Supp. 1522, 1527 (M.D. Ala. 1996).

Because plaintiff's evidence does not show that he was subjected to harassment sufficiently pervasive or serious so as to alter the terms and conditions of his employment, summary judgment for defendant is due to be granted as to plaintiff's racially hostile work environment claim.

16

## Count 4:  Retaliation

In order to establish a prima facie case of retaliation, Turner must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse action.  See Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir. 1999)(citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993)).

### 1.  The Final Warning and Five Day Suspension on May 22, 1998

In Turner's complaint, he states the following:

7.  In April of 1998 at a Union Negotiation, Turner told the upper level managers in the company that the defendant was discriminating against its African-American employees.

8.  After Turner complained of racial discrimination, the defendant retaliated against him.

9.  One clear act of retaliation occurred on May 22, 1998, when the defendant suspended Turner for five days and placed him on a one year probation when he woke an African-American employee sleeping on a forklift.

In Turner's brief, he states,

A month after Turner reported discrimination at the April 9, 1998 Union bargaining session and two days after Turner's May 20, 1998, complaint to Coats and Langham that they treated black and white employees differently in discipline, Coats wrote Turner up for 'interfering' with an 'investigation' of whether Doug Ware was asleep on his forklift and give him a Final Warning and five-day suspension without pay.

Plaintiff's brief at 43-44.

17

The court finds that the only protected activity at issue with respect to the write up on May 22, 1998, is Turner's complaint at the union meeting in April.  The court will not consider Turner's claim that his complaint of the discriminatory disciplinary treatment of Michael Riggs ("Riggs") on May 20, 1998, resulted in retaliation.  Stevens' records indicate that Riggs was disciplined on May 28, 1998, which means that Turner could not have complained about that discipline before May 22, 1998.  Therefore, Turner's complaint about Riggs' treatment could not have formed the basis for the alleged retaliation on May 22, 1998.

Considering only Turner's complaints at the union meeting, the court finds that Turner has produced evidence which, if believed by a jury, would demonstrate retaliation.  First, there is no dispute that complaining of racially discriminatory practices is a protected activity under Title VII.  There is also no dispute that receiving a final warning and a five day suspension is an adverse employment action.  Finally, the protected activity occurred in April and the discipline occurred in late May.  Therefore, the temporal proximity between the two satisfies the causal connection prong.

Stevens may rebut Turner's prima facie case of retaliation by offering a legitimate, non-discriminatory reason for its action.

18

Stevens says that Turner was written up because he interfered with its investigation of whether Ware was asleep. Because at the summary judgment stage the court must consider the evidence in the light most favorable to the non-movant, the court finds that Turner's testimony tends to show that Stevens' legitimate non-discriminatory reason for the write up was a pretext for discrimination. Turner testified that he woke Ware up only **after** Coats brought Langham over to witness that Ware was asleep. If Langham and Coats both had already confirmed that Ware was asleep, why would Turner's waking Ware up be an "interference" with their "investigation" of whether Ware was asleep? Also, Turner testified that neither Coats nor Langham said anything to him about not interfering until **after** he had already attempted to wake Ware. Although Coats and Langham may dispute Turner's testimony, the court cannot make credibility determinations at this stage. Thus, the court finds that there is a disputed issue of material fact with respect to whether Stevens retaliated against Turner when it wrote him up on May 22, 1998.

### 2. Termination

Turner's other allegation of retaliation cannot survive. Turner alleges that Coats fired him after Coats learned that Turner

19

might be involved in a class action.    However, a plaintiff's **possible** involvement in a class action is not equivalent to a plaintiff's engaging in protected activity.    Therefore, the court will grant defendant's motion as to plaintiff's claim that defendant retaliated against him because it suspected that he might be involved in a class action.

### Count 5:  Discrimination in Discipline

In order to establish a prima facie case of discrimination in discipline, a plaintiff must show:(1) that he is a member of a protected class; (2) that he was qualified for the job; and (3) that a similarly situated employee outside of the plaintiff's protected class engaged in the same or similar misconduct but did not receive similar discipline.  <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000)(citing <u>Lathem v. Deparment of Children and Youth Services</u>, 172 F.3d 786, 792 (11th Cir. 1999).

#### 1.  Parking violation

Stevens did not argue in its brief in support of its motion for summary judgment that Turner's claim of discrimination in discipline with respect to parking should be dismissed on summary judgment.    Stevens also did not address this particular claim in its reply brief.    The court will therefore not grant defendant's motion as to that claim.

### 2. Interfering with an investigation

As to Turner's claim that Stevens discriminated against him by not writing up other similarly situated white employees for "interfering with an investigation," the court finds that the chosen comparator, Debbie Turner, did not engage in similar behavior. Debbie Turner allegedly told supervisors that someone whom the supervisors thought had torn up a motor did not, in fact, tear it up. This is not the same thing as Turner's waking up Ware while Coats was "investigating" whether Ware was asleep on the job. Thus, the court finds that Turner has not shown that a white employee engaged in the same or similar misconduct but did not receive similar discipline.

### 3. Other discrimination in discipline

Turner's brief does not mention any other alleged instances of discrimination in discipline. Therefore, as to any other discrimination in discipline of which plaintiff might have complained, defendant's motion is granted. See Resolution Trust Corp., 43 F.3d at 599 (11th Cir. 1995).

Likewise, although Stevens argues in its brief that Turner cannot establish a claim for pattern or practice discrimination, Turner does not make any pattern or practice arguments in his brief. Thus, any claim that plaintiff may have had with respect to

21

pattern or practice discrimination is abandoned, and summary judgment is due to be granted to the extent that any claim existed. Id.

## Conclusion

A separate and appropriate order will be entered.

DONE this 30th day of May, 2000.

_____

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

22